2012 ME 101

**STATE of Maine**

v.

**Aaron J. PATTON.**

Supreme Judicial Court of Maine.

Argued: Feb. 15, 2012.
Decided: July 26, 2012.

Donald S. Hornblower, Esq. (orally),
Hornblower Lynch Rabasco & Van Dyke,

P.A., Lewiston, for appellant Aaron Patton.

Norman R. Croteau, District Attorney, and Nicholas S. Worden, Asst. Dist. Atty. (orally), Office of the District Attorney, Auburn, for appellee State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

LEVY, J.

[¶ 1] Aaron J. Patton appeals from a judgment of conviction entered in the Superior Court (Androscoggin County, *Marden, J.*) following a jury trial at which he was found guilty of four counts of gross sexual assault (Class B), 17-A M.R.S. § 253(2)(H) (2011); one count of unlawful sexual contact (Class C), 17-A M.R.S. § 255-A(1)(M) (2011); and two counts of sexual abuse of a minor (Class C), 17-A M.R.S. § 254(1)(A-2) (2011). Patton contends that the court erred in several respects, including (A) a constitutional error resulting from the court's decision to permit a State's witness, a police officer, to testify over Patton's objection about Patton's assertion of his right to remain silent shortly before his arrest, (B) the admission of evidence of Patton's use of hypnosis, (C) the admission of police officer testimony that contained inadmissible hearsay evidence and was unfairly prejudicial, and (D) the misstatement of jury instructions regarding section 253(2)(H). We disagree and affirm the judgment.

## I. BACKGROUND

[¶ 2] Aaron Patton was charged by indictment in Androscoggin County with four counts of gross sexual assault (Class B), 17-A M.R.S. § 253(2)(H); one count of unlawful sexual contact (Class C), 17-A M.R.S. § 255-A(1)(M); and one count of sexual abuse of a minor (Class C), 17-A M.R.S. § 254(1)(A-2). Patton was also charged separately in Franklin County with one count of sexual abuse of a minor (Class C), 17-A M.R.S. § 254(1)(A-2). The charges were consolidated for a jury trial on all seven counts. Viewing the evidence in the light most favorable to the jury's verdict, the record supports the following facts. *See State v. LaVallee-Davidson*, 2011 ME 96, ¶ 2, 26 A.3d 828.

[¶ 3] Patton married the victim's mother in 1999 and moved to Maine from California shortly thereafter. At the time, the mother had two young daughters from a previous relationship, including the victim, who was then six or seven years old. Patton and the mother had one child, a daughter, during their marriage. The mother and the children considered Patton to be a father figure within the household. He helped with homework, set rules for the household, and imposed discipline as needed. Although the victim maintained a good relationship with her biological father, she called Patton "Daddy."

[¶ 4] The victim testified that Patton first began touching her in a sexual manner when she was twelve years old, and that he continued to touch her breasts and genitals about once a week. She testified that she and Patton first had sexual intercourse when she was fourteen years old, in her bedroom at their home in Livermore Falls.[1] The victim testified that between that first incident and May 2009, she and Patton engaged in sex, including vaginal, oral, and anal sex, in the family home at least once a week.

1. The victim, who was born in August 1993, was fourteen years old in late 2007 and early 2008.

[¶ 5]   In February 2009, when the victim was fifteen years old, the victim's mother and Patton divorced.  Patton continued to live in the Livermore Falls home for a few months following the divorce and continued to help the children with homework and oversee household chores.   In May 2009, Patton moved to an apartment in Jay, where the victim visited him regularly, both after school and on some weekends.   The victim testified that she and Patton had sex every time she visited him at the Jay apartment, but she did not remember the specific dates.   Although the victim considered herself to be in a romantic relationship with Patton at that time, she also considered him to be her stepfather.

[¶ 6]   A number of the sexual encounters between Patton and the victim occurred when other children were in the house.   When he went into the bedroom alone with her to have sex, Patton told the other children that he was performing hypnotherapy on the victim.   Patton practiced hypnotherapy and he advertised his availability as a hypnotist in the local newspaper and through a sign posted on the front lawn of the Livermore Falls home.   He used hypnosis to assist people in breaking bad habits, such as smoking, and as a form of entertainment at parties.

[¶ 7]   Patton first hypnotized the victim when she was eight years old to help her stop biting her nails.   The victim believes that this hypnotism worked.   Patton also hypnotized her the day after they first had sexual intercourse, and Patton told her not to tell anyone about the sexual relationship.   The victim believes that Patton continued to hypnotize her when they had sex during her visits to his apartment in Jay and that the hypnotism helped to calm her.

[¶ 8]   At trial, Patton's attorney objected to the State's continued reference to hypnosis, arguing that there was no scientific basis for the State's apparent theory that Patton used hypnosis to control the victim and that this evidence was "highly and unfairly prejudicial."   The court overruled the objection.

[¶ 9]   In May 2010, the victim, when confronted by her mother, admitted that she and Patton had had sex.   The victim wrote a statement for the police describing her sexual relationship with Patton and the police obtained a search warrant to search Patton's apartment in Jay. At trial, one of the officers testified that, when he went to Patton's apartment to execute the search warrant and told Patton that he wanted to ask him some questions about Patton's relationship with the victim, Patton responded that he "needed to talk to his attorney."   Patton objected to this testimony, but the court allowed it.

[¶ 10]   Patton testified as the only witness for the defense.   During his testimony, Patton conceded that he had acted as a father to the victim during his marriage to her mother.   He also admitted that he had a sexual relationship with the victim and that they had had sex "numerous times," but he maintained that the sexual relationship started when the victim was sixteen years old.   He admitted that he purchased lingerie for the victim after she turned sixteen.   Patton testified that he had certification in hypnotherapy and used hypnosis for behavior modification, but he denied that he ever used hypnosis on the victim for sexual reasons.

[¶ 11]   The jury found Patton guilty on all counts.   The court sentenced him to six years' imprisonment for one count of gross sexual assault.   For another count of gross sexual assault, the court sentenced Patton to a consecutive term of six years' imprisonment, all suspended, with four years of probation.   Patton's sentences for the remaining counts were all suspended and ordered to be served concurrently with the

sentence for the first count of gross sexual assault.  This appeal followed.

## II.  LEGAL ANALYSIS

### A.  Patton's Statement That He Needed to Speak to His Attorney

[¶ 12]  Patton contends that the court erred by allowing a police officer to testify that Patton said he "needed to talk to his attorney" in response to the officer's request to speak with him about the victim. At trial, Patton objected to this expected testimony, arguing that his assertion of his constitutional rights cannot be used against him.  The court concluded that there was nothing unduly prejudicial or inadmissible about the testimony and overruled Patton's objection.  As a result, the officer provided the following testimony:

> Q.  Pick up where we left off, officer. You were at the door, you knocked on the door, I believe.  Did he come to the door?
>
> A.  He did.
>
> Q.  I realize I am backing up a little bit here but what did you say to him?
>
> A.  I identified myself as an officer with Livermore Falls Police Department, I explained to him that I wanted to ask him some questions about his relationship with [the victim].
>
> Q.  What was his response?
>
> A.  That he needed to talk to his attorney.
>
> Q.  After that did any questions to him cease on your part?
>
> A.  All questions ceased.
>
> Q.  All right.  After that, officer, what in fact did you do?
>
> A.  We informed Mr. Patton that we had a search warrant for his residence. We executed that search warrant.

[¶ 13]  Patton cited the Sixth Amendment right to counsel when making his objection.  On appeal, Patton again cites to the Sixth Amendment right to counsel, arguing that his right to due process, guaranteed by the Fourteenth Amendment, was violated when the officer was permitted to testify "that the Defendant had invoked his 6th Amendment constitutional right to counsel."  The State concedes error, noting: "The admission of [the officer's] statement is in direct contravention to the widely held notion that the Due Process Clause of the Fourteenth Amendment prohibits the prosecution from introducing testimony or making reference at trial to defendant's invocation of the right to remain silent."  Both parties reference the rule announced in *Doyle v. Ohio*, in which the United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment."  426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).  However, the State urges us to conclude that the error was harmless.

[¶ 14]  We disagree with both parties' characterizations of the constitutional right at stake here.  The Sixth Amendment right to counsel is not at issue when judicial proceedings have not yet been initiated against a defendant.  *See Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) ("[T]he right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." (quotation marks omitted)).  Here, when Patton was confronted by the police officers at his home, he had not yet been arrested or formally charged.  Similarly, the parties' reliance on the rule announced

in *Doyle* is misplaced. In *Doyle*, the Court reasoned that once *Miranda* warnings are given, a defendant's "post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." 426 U.S. at 617, 96 S.Ct. 2240. Here, Patton had not been given *Miranda* warnings before he made his statement, and the circumstances were pre-arrest and noncustodial—therefore, the *Doyle* rule does not apply. *See also Fletcher v. Weir*, 455 U.S. 603, 607, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam) ("In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand.").

▪ [¶ 15] In this context, Patton's request to speak with his attorney—before receiving *Miranda* warnings or being taken into custody—is more properly viewed as his assertion of his right to remain silent protected by the Fifth Amendment's Self–Incrimination Clause. *See Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (concluding that "the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves"); *see also Wainwright v. Greenfield*, 474 U.S. 284, 295 n. 13, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (noting that "silence" includes "the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted"). The Fifth Amendment prevents the prosecution or the court from commenting on a defendant's decision not to testify at his criminal trial, *see Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), but the question of whether the Fifth Amendment's protections extend to prevent the introduction in evidence of a defendant's pre-arrest, pre-*Miranda* silence in the State's case-in-chief has not been addressed by the United States Supreme Court. Indeed, as we have recognized before, there is a split among the federal circuits on this issue. *See State v. Millay*, 2001 ME 177, ¶ 17 & n. 4, 787 A.2d 129 (outlining circuit split); *see also United States v. Ashley*, 664 F.3d 602, 604 (5th Cir.2011) (outlining circuit split, noting that the "Fourth, Ninth, and Eleventh Circuits permit the government to use such evidence, reasoning that the protections against self-incrimination do not apply before a suspect is arrested and has been given *Miranda* warnings" but that the "First, Sixth, Seventh, and Tenth Circuits hold the Fifth Amendment privilege against self-incrimination prohibits the use of prearrest, pre-*Miranda* silence as substantive evidence").

[¶ 16] Nevertheless, we need not resolve this question here today because the State has conceded error. We therefore turn our inquiry to whether, as the State contends, any error was harmless.

▪ [¶ 17] A constitutional error made at trial may be deemed harmless if "we are satisfied beyond a reasonable doubt that the error did not contribute to the verdict obtained." *State v. Warren*, 1998 ME 136, ¶ 17, 711 A.2d 851. When conducting a constitutional harmless error analysis, we review the trial record as a whole. *Id.* ¶¶ 15–17. Having done so here, we agree with the State that any error was harmless.

[¶ 18] After the police officer testified that Patton had said he needed to talk to his attorney, the State did not seek to capitalize on that testimony. Throughout the course of the trial, the State never again referred to Patton's expressed desire to speak with his attorney, either through

its questioning of witnesses or in closing argument. Thus, it was never suggested to the jury that Patton's statement to the officer should be viewed as evidence of his guilt. Given the strength of the other evidence the State presented at trial—as well as Patton's own testimony in which he admitted to having had a sexual relationship with his former stepdaughter and only disputed when the relationship occurred—we are satisfied beyond a reasonable doubt that the isolated reference to Patton's desire to speak to his attorney was not sufficiently harmful to have affected the jury's verdict.[2] *See, e.g., Fugate v. Head*, 261 F.3d 1206, 1223 (11th Cir.2001) (concluding that unconstitutional references to defendant's silence were harmless because the references were "brief" and the "prosecutor did not repeat the references, question other witnesses regarding them, or address them during closing argument"). Because we are satisfied beyond a reasonable doubt that any error in admitting this evidence did not contribute to the verdict obtained, we conclude that the error was harmless.

### B. Hypnosis Evidence

[¶ 19] Patton also asserts that the court abused its discretion when it admitted evidence regarding Patton's use of hypnosis and his experience as a hypnotherapist. Patton contends that (1) the victim's and her mother's testimony about hypnosis did not meet the standards described in M.R. Evid. 701 for opinion testimony by lay witnesses, and (2) the probative value of the testimony was so outweighed by its unfair prejudicial effect that the court should have ex-

cluded the testimony pursuant to M.R. Evid. 403.

### 1. Lay Witness Opinion Testimony

[¶ 20] Rule 701 of the Maine Rules of Evidence permits lay witnesses to provide testimony in the form of an opinion or inference if the testimony is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Opinion testimony "by a lay witness may be permissible if based on [her] own perception, [but] such perception must be adequately grounded on personal knowledge or observation just as would be the case with simple statements of fact." *Mitchell v. Kieliszek*, 2006 ME 70, ¶ 13, 900 A.2d 719 (quotation marks omitted). We review challenges to the admission of lay opinion testimony for an abuse of discretion. *State v. Cunningham*, 1997 ME 60, ¶ 4, 691 A.2d 1219.

[¶ 21] The court did not abuse its discretion when it permitted the victim to testify about Patton's use of hypnosis and its effects on her because the testimony was largely factual, based on the victim's personal knowledge, and aided the jury in understanding the victim's perception of her relationship with Patton. The victim testified that Patton was a certified hypnotherapist who provided his hypnotherapy services to help clients "break bad habits"—a reasonable observation the victim could draw from the fact that Patton advertised his abilities on a sign posted on the front lawn and saw clients in their family home. The victim's testimony about Patton's use of hypnotism on her

2. This case is distinguishable from the circumstances of *State v. Diaz*, 681 A.2d 466 (Me.1996). In *Diaz*, although it is unclear whether the defendant testified at trial, it is clear that the State encouraged the jury to infer guilt from the defendant's silence because the State referred to the defendant's failure to answer an officer's questions both in its closing argument and in rebuttal. *Id.* at 469.

was based on her own direct experience of being hypnotized by him, an experience that she believed worked, both to help her stop biting her nails and to make her feel calmer about their sexual encounters. The testimony helped to explain the nature of Patton and the victim's relationship, and, to the extent that it included her opinion as to the effects of the hypnosis, was based on her own perception and observations.

[¶ 22] Similarly, the court did not abuse its discretion when it permitted the victim's mother to testify about Patton's use of hypnosis. The mother also testified that Patton was a certified hypnotherapist who advertised in the local paper and through a sign on their front lawn, and that Patton saw clients in the family home. As was true with the victim's testimony, the mother's testimony was largely factual and was not a matter of opinion. To the extent that her description of the effects resulting from Patton's use of hypnosis on her, her daughter, and others could be considered opinion testimony, the mother's opinion was based on her observations and knowledge of Patton's work as a hypnotist, as she was married to Patton for nearly ten years and lived in the home in which he saw clients.

[¶ 23] Patton further contends that the testimony should have been excluded because "even in the cases involving expert testimony, the investigative use of hypnosis itself is unsettled and controversial." This argument relies on case law addressing the reliability of hypnosis to improve recall and enhance testimony. *See, e.g., Rock v. Arkansas,* 483 U.S. 44, 61, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Mersch v. City of Dallas,* 207 F.3d 732, 735–36 (5th Cir.2000) (reviewing the ad-

missibility of post-hypnotic testimony); *House v. State,* 445 So.2d 815, 817 (Miss. 1984) ("We today consider for the first time the use in aid of a criminal prosecution of testimony adduced through hypnosis."). The evidence concerning hypnosis that was introduced in this case was relevant not to establish the reliability of hypnosis, but rather to explain an activity that Patton engaged in with the victim as part of their relationship and which he used as justification for being alone with the victim in her bedroom.

### 2. Unfair Prejudice

[¶ 24] Similarly, the court did not abuse its discretion when it allowed in evidence the photograph of a book[3] recovered from Patton's apartment entitled "Sex and Hypnosis" and witness testimony regarding hypnosis because this evidence was not unfairly prejudicial. *See State v. Lipham,* 2006 ME 137, ¶ 9, 910 A.2d 388 (noting that a trial court's decision to admit evidence pursuant to M.R. Evid. 403 is reviewed for an abuse of discretion). Rule 403 of the Maine Rules of Evidence provides that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." The Rule does not prevent the introduction of all prejudicial evidence, but only evidence that is *unfairly* prejudicial. *Lipham,* 2006 ME 137, ¶ 9, 910 A.2d 388.

[¶ 25] Unfairly prejudicial evidence is evidence that has "an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." *State v. Forbes,* 445 A.2d 8, 12 (Me.1982) (quotation marks omitted). Unlike, for example, a particularly "gruesome" photograph of a murder victim, *State v. Conner,* 434 A.2d 509, 513

---

**3.** Only the photograph was introduced in evidence; the actual book was never presented to the jury or the court.

(Me.1981), there is nothing inherently prejudicial about the subject of hypnosis or the practice of hypnotherapy. Indeed, as Patton himself testified, hypnosis is often employed as a method of behavior modification, and he used hypnotism to help the victim stop biting her nails, to assist his wife in childbirth, and to entertain at parties. Patton disputed only that he used hypnotism in his sexual relationship with the victim.

[¶ 26] Furthermore, the evidence of Patton's use of hypnosis and his possession of a book concerning hypnosis and sex was relevant. *See* M.R. Evid. 401, 402. As already mentioned, each of the crimes charged against Patton concerned the nature of his relationship with the victim when she was of a specific age. *See* 17–A M.R.S. §§ 253(2)(H), 254(1)(A–2), 255–A(1)(M); *see also State v. Dilley,* 2008 ME 5, ¶ 28, 938 A.2d 804 ("To determine whether evidence is relevant, a court must examine the elements of the crimes charged."). Because each of the counts in the indictment corresponded to a different date over the course of two years, the State was required to prove not only that Patton had a sexual relationship with the victim, but also that the relationship was extant during a specific period of time. The evidence regarding Patton's use of hypnosis helped to establish the periods in which Patton had the opportunity to be alone with the victim and explained how their sexual relationship continued for such a long period of time, undetected by the other household members.

[¶ 27] The court did not abuse its discretion when it permitted the introduction of evidence regarding Patton's use of hypnosis because the danger of any unfair prejudice did not outweigh the probative value of the evidence.

## C. Police Officer Testimony: Hearsay and Unfair Prejudice

[¶ 28] Patton contends that the testimony of two police officers contained inadmissible hearsay and was unfairly prejudicial. In particular, one officer testified that the victim told him that Patton used a specific brand of lubricant during intercourse, that he bought the victim lingerie, and that he began having sex with the victim when she was fourteen years old; the other officer testified that the victim told him that Patton used a specific brand of condoms and lubricant. Because Patton did not object to this testimony at trial, any error committed by the trial court in admitting this evidence is reviewed for obvious error. *See State v. Waterhouse,* 513 A.2d, 862, 864 (Me.1986) ("As no objection was made at trial, we review admission of the evidence ... only for obvious error.").

### 1. Hearsay

[¶ 29] The testimony of the police officers regarding the substance of the victim's statements to them was hearsay. *See* M.R. Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Here, both officers testified about the substance of the victim's statements to them, and there is no indication that the testimony was offered for any reason other than to prove the truth of the content of the victim's statements. Indeed, one of the statements at issue concerned the victim's age at the time Patton began having sex with her, which was a critical fact in dispute. None of the hearsay exceptions apply to this situation. *See* M.R. Evid 802 (providing that hearsay is not admissible unless there is an applicable exception in the law or the rules); *State v. Lafrance,*

589 A.2d 43, 45 (Me.1991) (recognizing three distinct situations in which the out-of-court statements of a victim of sexual assault may be admitted into evidence: "(1) to show that in fact a complaint has been made, (2) to prove the truth of the matter asserted if the statement qualifies as an excited utterance, and (3) to rebut a charge of recent fabrication or improper motive").[4]

[¶ 30] However, the admission of this hearsay testimony does not constitute obvious error because the error did not affect Patton's substantial rights. Obvious error review requires us to consider if there is "(1) an error, (2) that is plain, and (3) that affects substantial rights." *State v. Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147. "If these conditions are met, we will exercise our discretion to notice an unpreserved error only if we also conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings." *Id.* "[A]n error affects a criminal defendant's substantial rights if the error was sufficiently prejudicial to have affected the outcome of the proceeding." *Id.* ¶ 34.

[¶ 31] Here, although the victim's age at the time the sexual relationship began was a critical fact in dispute, the victim herself testified to that fact and was subject to cross-examination regarding it, and the jury had the opportunity to assess her credibility directly. The testimony about the lubricant, condoms, and lingerie did not affect Patton's substantial rights because Patton acknowledged from the very beginning of the trial that he had a sexual relationship with the victim. Therefore, the admission in evidence of the officers' testimony regarding statements made to them by the victim was not obvious error.

### 2. No Unfair Prejudice

[¶ 32] The officers' testimony was also not unfairly prejudicial. As previously mentioned, evidence is unfairly prejudicial if its probative value is outweighed by the danger it presents of unfair prejudice. *Waterhouse*, 513 A.2d at 865. The victim's statements to the officers were directly relevant to the sexual relationship between Patton and the victim, and the existence of that relationship was a critical element of each of the charges against Patton. *See* 17-A M.R.S. §§ 253(2)(H), 254(1)(A-2), 255-A(1)(M). Furthermore, there is nothing inherently inflammatory about evidence of condoms, lubricant, lingerie, and the age of the vic-

---

4. The first exception, known as the "first complaint rule," *see State v. Krieger*, 2002 ME 139, ¶ 18, 803 A.2d 1026, does not apply in this case for two reasons. First, by the time the officers testified at trial, the victim's mother had already testified that the victim had told her about the sexual relationship with Patton, *see State v. Palmer*, 624 A.2d 469, 471 (Me.1993) (concluding that the first complaint rule exception did not apply because "prior testimony had already established that the victim made a complaint"), and second, both officers' testimony contained details beyond the scope of the rule's protection, *see State v. Joel H.*, 2000 ME 139, ¶ 23, 755 A.2d 520 ("The only details that are admissible are those necessary to identify the complaint as being relevant to the charge on which the accused is being tried."), *see also State v. True*, 438 A.2d 460, 464 (Me.1981) ("The bare *fact* that a complaint has been made is admissible as part of the State's case in chief to forestall the natural assumption that in the absence of a complaint, nothing violent had occurred."). The excited utterance exception does not apply because the victim's statement to the officers was made several months after the victim last saw Patton. *See* M.R. Evid. 803(2). The exception to rebut a charge of recent fabrication, which follows M.R. Evid. 801(d)(1), does not apply because there is no indication from the record of any charge that the victim fabricated her story or was improperly influenced since giving her statement to the officers.

tim when a defendant began having sex with her.

### D. Jury Instructions Regarding 17–A M.R.S. § 253(2)(H)

▇▇ [¶ 33] Patton asserts that the court erred when, in response to the jury's request for clarification, the court misstated the statutory language of 17–A M.R.S. § 253(2)(H) by omitting the word "similar." Section 253(2)(H) provides that a person commits gross sexual assault by engaging in a sexual act with another person when that "other person has not in fact attained the age of 18 years and the actor is a parent, stepparent, foster parent, guardian or other similar person responsible for the long-term care and welfare of that other person." During jury deliberations, the foreman sent a note to the court asking for clarification on two issues, one of which concerned the term "or other similar person responsible" as employed in section 253(2)(H). The court discussed the questions with counsel, and then brought the jury back into the courtroom to answer their questions. Regarding the "or other similar person responsible" question, the court stated:

> Let's look at the language of those counts that charge gross sexual assault. You are charged with determining from the evidence whether the State has proven beyond a reasonable doubt that on or about the dates that are in the count, at a location in this county, you find the State has proven that the defendant was a parent, stepparent, foster parent, guardian or other person responsible for the long-term care and welfare of [the victim], and you must find that he engaged in a sexual act with

[the victim] who had not in fact attained the age of 18.

After the jury left, the court asked if there were any objections to the explanation given to the jury. Patton concedes that he did not object to the clarification instructions at trial; therefore any error is reviewed under the obvious error standard. *See* M.R.Crim. P. 52(b); *Pabon*, 2011 ME 100, ¶ 18, 28 A.3d 1147.

▇▇ [¶ 34] The court did not commit obvious error by omitting the word "similar." On appeal, jury instructions are reviewed "as a whole to ensure that they informed the jury correctly and fairly in all necessary respects of the governing law." *State v. Preston*, 2011 ME 98, ¶ 15, 26 A.3d 850 (quotation marks omitted). Although the court omitted the term "similar" when responding to the jury's question, the court did include the term in the earlier instructions given before deliberations began. In *State v. Child*, we found no obvious error when the trial court omitted an element of a crime once, but correctly stated the elements several other times during jury instructions. 1999 ME 198, ¶¶ 9–12, 743 A.2d 230. Here, any error was not nearly so egregious because "similar" was not an element of the offense. Furthermore, considering the court's instructions as a whole, the term "other person responsible for the long-term care and welfare of a child" necessarily describes a person who is acting in a role similar to that of a parent, stepparent, foster parent, or guardian. Therefore, the instructions were sufficient to inform the jury of the elements required for it to find Patton guilty pursuant to section 253(2)(H).[5]

---

5. For this reason we also disagree with, and do not separately address, Patton's assertion that the portion of 17–A M.R.S. § 253(2)(H) (2011) addressing "or other similar person responsible for the long-term care and welfare of that other person" is unconstitutionally vague. *See State v. Aboda*, 2010 ME 125, ¶ 15, 8 A.3d 719 (noting that, when reviewing

The entry is:

Judgment of conviction affirmed.

a statute for vagueness, we test the statute in the circumstances of the individual case and consider "whether the statutory language was sufficiently clear to give the defendant adequate notice that his conduct was proscribed").